UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

JOSEPH L.,[1]

      Plaintiff,

v.

COMMISSIONER OF SOCIAL
SECURITY,

      Defendant.

_____

20-CV-0064-LJV
DECISION & ORDER

On January 17, 2020, the plaintiff, Joseph L. ("Joseph"), brought this action under the Social Security Act ("the Act"). He seeks review of the determination by the Commissioner of Social Security ("Commissioner") that he was not disabled.[2] Docket Item 1. On October 28, 2020, Joseph moved for judgment on the pleadings, Docket Item 15; on December 23, 2020, the Commissioner responded and cross-moved for

---

[1] To protect the privacy interests of social security litigants while maintaining public access to judicial records, this Court will identify any non-government party in cases filed under 42 U.S.C. § 405(g) only by first name and last initial. Standing Order, Identification of Non-government Parties in Social Security Opinions (W.D.N.Y. Nov. 18, 2020).

[2] Joseph applied for both Social Security Income ("SSI") and Disability Insurance Benefits ("DIB"). One category of persons eligible for DIB includes any adult with a disability who, based on her quarters of qualifying work, meets the Act's insured-status requirements. *See* 42 U.S.C. § 423(c); *see also Arnone v. Bowen*, 882 F.2d 34, 37-38 (2d Cir. 1989). SSI, on the other hand, is paid to a person with a disability who also demonstrates financial need. 42 U.S.C. § 1382(a). A qualified individual may receive both DIB and SSI, and the Social Security Administration uses the same five-step evaluation process to determine eligibility for both programs. *See* 20 C.F.R §§ 404.1520(a)(4) (concerning DIB); 416.920(a)(4) (concerning SSI).

judgment on the pleadings, Docket Item 17; and on January 13, 2021, Joseph replied, Docket Item 18.

For the reasons stated below, this Court grants Joseph's motion in part and denies the Commissioner's cross-motion.

## STANDARD OF REVIEW

"The scope of review of a disability determination . . . involves two levels of inquiry." *Johnson v. Bowen*, 817 F.2d 983, 985 (2d Cir. 1987). The court "must first decide whether [the Commissioner] applied the correct legal principles in making the determination." *Id.* This includes ensuring "that the claimant has had a full hearing under the . . . regulations and in accordance with the beneficent purposes of the Social Security Act." *Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir. 2009) (quoting *Cruz v. Sullivan*, 912 F.2d 8, 11 (2d Cir. 1990)). Then, the court "decide[s] whether the determination is supported by 'substantial evidence.'" *Johnson*, 817 F.2d at 985 (quoting 42 U.S.C. § 405(g)). "Substantial evidence" means "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). "Where there is a reasonable basis for doubt whether the [Administrative Law Judge ('ALJ')] applied correct legal principles, application of the substantial evidence standard to uphold a finding of no disability creates an unacceptable risk that a claimant will be deprived of the right to have her disability determination made according to correct legal principles." *Johnson*, 817 F.2d at 986.

**DISCUSSION**

Joseph argues that the ALJ erred in two ways.  Docket Item 15-1.  First, Joseph argues that the ALJ failed to properly evaluate the opinions of his treating physician assistant, Heather Larson, PA-C.  *Id.* at 1.  Second, he argues that the ALJ's residual functional capacity ("RFC") determination is unsupported by substantial evidence.  *Id.*  This Court agrees that the ALJ erred and, because that error was to Joseph's prejudice, remands the matter to the Commissioner.[3]

When determining a plaintiff's RFC, an ALJ must evaluate every medical opinion received, "[r]egardless of its source."  20 C.F.R. § 404.1527(c).  That evaluation requires the ALJ to resolve "[g]enuine conflicts" among the sources.  *Burgess v. Astrue*, 537 F.3d 117, 128 (2d Cir. 2008) (citation omitted).  And before an ALJ may deny a claimant's application, she must "confront the evidence in [the claimant's] favor and explain why it was rejected."  *Thomas v. Colvin*, 826 F.3d 953, 961 (7th Cir. 2016).

"[O]nly 'acceptable medical sources' can be considered treating sources . . . whose medical opinions may be entitled to controlling weight.  'Acceptable medical sources' are further defined (by regulation) as licensed physicians, psychologists, optometrists, podiatrists, and qualified speech-language pathologists."  *Genier v.*

---

[3]  This Court assumes familiarity with the underlying facts, the procedural history, and the ALJ's decision and will refer only to the facts necessary to explain its decision.

*Astrue*, 298 F. App'x 105, 108 (2d Cir. 2008) (citing 20 C.F.R. § 416.913(a) and SSR 06-03P, 2006 WL 2329939 (Aug. 9, 2009)).

An ALJ also must consider the opinions of "other sources"—including physician assistants[4]—but is "free to discount" such opinions "in favor of the objective findings of other medical doctors." *Id.* Nevertheless, the ALJ should explain the weight assigned to the opinions of "other sources" that "may have an effect on the outcome of the case." 20 C.F.R. § 404.1527(f)(2). And the ALJ should do so in a way that "allows a claimant or subsequent reviewer to follow the [ALJ's] reasoning." SSR 06-03P, 2006 WL 2329939, at *6 (Aug. 9, 2006).

The Code of Federal Regulations ("the Code"), 20 C.F.R. § 404.1527(c), enumerates six factors that the ALJ is to consider in giving weight to the opinion of an "other source":

> [1] the length and frequency of the treating relationship; [2] the nature and extent of the relationship; [3] the amount of evidence the source presents to support his or her opinion; [4] the consistency of the opinion with the

---

[4] When Joseph filed his claim in July 2016, physician assistants were "other source[s]," *see* 20 C.F.R. § 416.913(d)(1) (2015), whose opinions could not "establish the existence of a medically determinable impairment"; but an opinion from such a source still could "outweigh the opinion of an 'acceptable medical source[]' . . . [if, f]or example, . . . [the source] has seen the individual more often . . . and has provided better supporting evidence and a better explanation for his or her opinion," *see* Titles II and XVI: Considering Opinions and Other Evidence from Sources Who Are Not "Acceptable Medical Sources" in Disability Claims, 71 Fed. Reg. 45,593, 45,596 (Aug. 9, 2006); *cf.* 20 C.F.R. § 416.902(a)(7) (2017) (expanding list of "acceptable medical sources" to include "licensed advanced practice registered nurse[s]"). Because PA-C Larson treated Joseph multiple times a year since 2016, an ALJ reasonably could find that her opinions deserve significant weight.

4

    record; [5] the source's area of specialization; [6] and any other factors the claimant brings to the ALJ.

See Tolliver v. Astrue, 2013 WL 100087, at *3 (W.D.N.Y. Jan. 7, 2013) (citations omitted) (summarizing the factors from the Code).  Using those factors to articulate the ALJ's reasoning is more than just a good idea.  In Tolliver, for example, the court remanded when the ALJ failed to use those factors to explain why he assigned little weight to the "other source" opinion of a nurse practitioner who saw the patient more frequently than did the treating physician.  Id.; cf. Estrella v. Berryhill, 925 F.3d 90, 96 (2d Cir. 2019) (holding that "[a]n ALJ's failure to 'explicitly' apply the [section 404.1527(c)] factors when assigning weight" to a treating source opinion "is a procedural error" (quoting Selian v. Astrue, 708 F.3d 409, 418 (2d Cir. 2013) (per curiam))).

    PA-C Larson addressed Joseph's medical conditions in five opinions over a two-year period.  Docket Item 12 at 772-73 (medical examination for employment assessment dated June 24, 2016); id. at 781-82 (medical examination for employment assessment dated August 29, 2016); id. at 785-86 (medical examination for employment assessment dated November 29, 2016); id. at 799-801 (medical examination for employment assessment dated July 11, 2017); id. at 853-56 (physical residual functional capacity questionnaire dated September 18, 2018).  She diagnosed Joseph with diarrhea, chronic abdominal pain in the left upper quadrant ("LUQ"), and fatigue.  Id. at 772, 781, 785, 799, 853.  She noted that Joseph's abdominal pain fluctuated in intensity, but she opined that it was severe enough to "interfere with [his] attention and concentration to perform even simple work tasks . . . [o]ccasionally."  Id. at 853-54.  The "clinical findings and objective signs" underlying PA-C Larson's opinions

5

included "LUQ tenderness on exam [and] labs show[ing] chronic vit[amin] D deficiency despite supplementation," but the underlying cause of Joseph's chronic gastrointestinal issues was "unknown despite extensive work-up." *Id.* at 853.

PA-C Larson opined that Joseph was "[v]ery [l]imited" in his ability to carry, lift, push, pull, and bend and that he could not lift, push, or pull more than five pounds. *Id.* at 773, 782, 786, 801. She also found that Joseph was "[m]oderately [l]imited in his ability to walk, stand, and sit. *Id.* More specifically, she found that Joseph was limited to "standing or walking [for] 15 min[ute] intervals," *id.*; sitting for four hours in an eight-hour day, *id.* at 855; and standing or walking for four hours in an eight-hour day, *id.* Joseph also needed ten-minute "periods of walking around" every one to two hours. *Id.*

PA-C Larson also opined that Joseph needed one to two unscheduled breaks a day, lasting ten to fifteen minutes each, to accommodate his chronic diarrhea. *Id.* And she found that because Joseph had "good days" and "bad days," he "likely" would miss two days of work each month.[5] *Id.* at 856.

The ALJ afforded PA-C Larson's opinions "little weight," reasoning that

> [PA-C Larson's] opinions are mostly inconsistent with the relatively benign objective findings of record. There is minimal objective evidence to support [the finding that Joseph] would need unscheduled breaks or would be absent from work at the frequency she suggested. Furthermore, [PA-C

---

[5] PA-C Larson also limited Joseph to carrying less than ten pounds frequently; carrying ten to twenty pounds occasionally; never carrying fifty pounds; rarely climbing ladders; and occasionally climbing stairs, squatting, couching, bending, and twisting. Docket Item 12 at 856.

>Larson] is not an acceptable medical source[,] and her comments about [Joseph's] psychological condition appear beyond her medical expertise.

*Id.* at 28.

The ALJ failed to consider several of the section 404.1527(c) factors before assigning "little weight" to PA-C Larson's opinions. For example, the ALJ never mentioned that PA-C Larson had treated Joseph three to six times a year since February 2016, nor did she recognize that PA-C Larson specialized in gastroenterology. *See id.* In other words, the ALJ did not consider "the length and frequency of the treating relationship" or "the source's area of specialization." *See Tolliver*, 2013 WL 100087, at *3. And while the ALJ said that PA-C Larson's opinions were "inconsistent" with other "benign" findings in the record, Docket Item 12 at 28, the ALJ did not say what that inconsistent evidence was, and she certainly did not explicitly address "the amount of evidence . . . support[ing] [the] opinion," *see Tolliver*, 2013 WL 100087, at *3.

"Because the ALJ procedurally erred, the question becomes whether . . . the record otherwise provides 'good reasons' for assigning '[little] weight'" to PA-C Larson's opinions. *See Estrella*, 925 F.3d at 96 (alterations and citation omitted); *see also Zabala v. Astrue*, 595 F.3d 402, 410 (2d Cir. 2010) (declining remand where "application of the correct legal principles to the record could lead [only to the same] conclusion"). The Court finds no such assurance here.

In fact, the 20 C.F.R. § 404.1527(c) factors support assigning PA-C Larson's opinions significant weight. First, PA-C Larson appears to be the provider with the longest treatment history in the record and is a specialist in gastroenterology. Therefore, she was uniquely situated to understand how Joseph's chronic

7

gastrointestinal impairments affected his functional ability.  *See id.* (considering the length and frequency of the treating relationship as well as any area of specialization).

PA-C Larson's opinions also were supported by her own treatment notes.  *See id.* (considering the amount of evidence that supports an opinion).  Those notes consistently reported chronic diarrhea two to fifteen times a day and abdominal and epigastric tenderness alleviated by laying down or stretching upright.  *See, e.g.*, Docket Item 12 at 410 (treatment notes dated February 24, 2016: "[Joseph] has 5-10 mushy to watery BMs per day"); *id.* at 443 (treatment notes dated May 25, 2016: "[Joseph] is feeling worse . . . [he c]omplains of LUQ pain described as [a] sharp and bulging-like sensation [that r]adiates around to h[is] back. . . . [It is p]artially alleviated by laying supine. . . . [He i]s presently having 2-3 loose/watery BMs/day with taking 4-5 Imodium per day.  He is having less nocturnal BMs.  [He h]ad an episode of rectal bleeding last week"); *id.* at 447 (treatment notes dated July 15, 2016: "[Joseph i]s presently having 6 soft BMs daily with taking 1 Imodium . . . [and r]arely has rectal bleeding. . . . LUQ pain is [a] constant . . . throbbing/pulsating sensation[,] . . .[and is p]artially alleviated by laying down"); *id.* at 452 (treatment notes dated August 26, 2016: "[Joseph c]ontinues to have constant pain in [the] epigastric region and LUQ . . . [p]ain is . . . [p]artially alleviated by stretching upright. . . . [He h]as at least 10 watery BMs [i]f he does not take Imodium"); *id.* at 626 (treatment notes dated September 30, 2016: "[Joseph i]s having 5-10 BMs per day with taking 2 Imodium per day.  Stool consistency is watery"); *id.* at 643 (treatment notes dated June 26, 2018: "[Joseph i]s having 10-12 BMs/day").

And contrary to the ALJ's assertion, PA-C Larson's opinions were, in fact, supported by other notes in the record.  *See* 20 C.F.R. § 404.1527(c) (considering the

consistency of the opinion with the record). For example, treatment notes from Sunrise Medical Group, Joseph's primary care provider, regularly noted that Joseph had severe daily diarrhea, severe abdominal pain, and "shooting pains without a cause." *See, e.g.*, Docket Item 12 at 262, 273, 677, 765. Consulting psychologist Janine Ippolito, Psy. D., also reported that Joseph "w[oke] up four times per night due to chronic vomiting." *Id.* at 609; *see also id.* at 779 (Erie County Department of Social Services's finding that Joseph was very limited in lifting, carrying, bending, pushing, and pulling; moderately limited in standing and climbing stairs; and limited to standing and walking for fifteen-minute intervals.). And Joseph testified at the hearing that he used the bathroom fifteen to thirty times a day and "[a]t least three times" at night. *Id.* at 58, 71. In fact, Joseph said that he had to stop to use the bathroom twice on his way to the hearing, and the ALJ had to pause the hearing so that Joseph could use the bathroom. *Id.* at 68.

      The Commissioner echoes the ALJ and argues that the ALJ was justified in discounting PA-C Larson's opinions because they were "not consistent with the generally benign clinical findings . . . [and] essentially normal findings upon examination." Docket Item 17-1 at 21. But PA-C Larson identified Joseph's abdominal tenderness as a clinical finding supporting her conclusions, *see* Docket Item 12 at 853, something that Joseph's other providers found as well, *id.* at 273, 764 (treatment notes from Sunrise Medical Group finding abdominal pain and discomfort); *id.* at 606 (John Schwab, D.O., finding abdominal tenderness). Neither the ALJ nor the Commissioner can "play[] doctor" and "substitute his [or her] own judgment for [a] competent medical opinion." *Tammy C.-J. v. Comm'r of Soc. Sec.*, 2021 WL 773414, at *5 (W.D.N.Y. Feb. 26, 2021).

9

Even more basically, both PA-C Larson and Sunrise Medical Group acknowledged that despite "extensive" testing, the underlying cause of Joseph's gastrointestinal issues remained unclear.  *See* Docket Item 12 at 677, 692, 853.  Of course, that does not mean that Joseph's diarrhea and abdominal pain were not real.  The ALJ's reliance on what she perceived to be "benign" physical examinations to suggest otherwise therefore was error.  *Cf. Alazawi v. Comm'r of Soc. Sec.*, 2019 WL 4183910, at *3 (W.D.N.Y. Sept. 4, 2019) ("The ALJ's citing of the normal physical examination findings at the consultative examination, like normal gait and strength, as an example of inconsistency with the opinion is not relevant to the Crohn's disease.").

The Commissioner also argues that Dr. Schwab's consulting opinion, which found that Joseph had no physical limitations, supports the ALJ's finding of no disability because "[t]he opinions of consultative doctors can constitute substantial evidence." Docket Item 17-1 at 21 (citing *Mongeur v. Heckler*, 722 F.2d 1033, 1039 (2d Cir. 1983)). While the ALJ could have "discount[ed]" PA-C Larson's opinions "in favor of the objective findings of other medical doctors" such as Dr. Schwab, *see Genier*, 298 F. App'x at 108-09, the ALJ did not say whether that was what she did here.  In fact, the ALJ gave Dr. Schwab's opinion only "partial weight" because Joseph's "impairments are more limiting that what [Dr. Schwab] concluded."  Docket Item 12 at 28.  So if the ALJ indeed meant to discredit PA-C Larson's opinions for Dr. Schwab's, that judgment and the reason behind it are missing from the ALJ's decision.[6]  Because "[t]he grounds upon

---

[6] Additionally, the Commissioner argues that "the accuracy of the June 2016 form completed by PA Larson is questionable by the fact that [the p]laintiff applied for and received unemployment compensation for the second quarter of 2016."  Docket Item 17-1 at 22.  "Courts in the Second Circuit have held that an ALJ may consider evidence that the claimant received unemployment benefits and/or certified that he was ready,

10

which an administrative order must be judged are those upon which the record discloses that its action was based," *Sec. & Exch. Comm'n v. Chenery Corp.*, 318 U.S. 80, 87 (1943), the Commissioner's *post hoc* rationalization lacks merit.[7]

The ALJ's error here was not harmless.  Having discounted PA-C Larson's opinions, the ALJ found that Joseph had the RFC "to perform light work[8] as defined in 20 CFR [§§] 404.1567(b) and 416.967(b)[,] except that he can occasionally operate foot controls bilaterally[;] . . . can never climb ladders, ropes or scaffolds[,] or work at

---

willing, and able to work during the time period for which he claims disability benefits as adverse factors in the ALJ's credibility determination." *Felix v. Astrue*, 2012 WL 3043203, at *10 (E.D.N.Y. July 24, 2012).  "[R]eceipt of unemployment benefits does not preclude the receipt of Social Security disability benefits," however, "but [] 'is only one of the many factors that must be considered in determining whether the claimant is disabled.'" *Plouffe v. Astrue*, 2011 WL 6010250, at *22 (D. Conn. Aug. 4, 2011) (citing "an SSA Memorandum, dated August 9, 2010").  So while the ALJ permissibly could have considered the fact that Joseph received unemployment for one quarter in 2016 when weighing his credibility, that would not have been a sufficient reason to discount PA-C Larson's opinions.  And, in any event, the ALJ did not cite Joseph's unemployment benefits as a reason that she discounted PA-C Larson's opinions.

[7] Even if the ALJ intended to reject PA-C Larson's opinions in favor of Dr. Schwab's, that would not remedy the error.  Indeed, the ALJ gave Dr. Schwab's opinion only "partial weight," and it does not support many of the ALJ's RFC determinations. *See* Docket Item 12 at 28.  More important, although the opinion of a consultative examiner can in some circumstances provide substantial evidence in support of an ALJ's opinion, *see Mongeur*, 722 F.2d at 1039, the Second Circuit has "cautioned that ALJs should not rely heavily on the findings of consultative physicians after a single examination," *Estrella*, 925 F.3d at 98 (quoting *Selian*, 708 F.3d at 419)).  That admonition seems particularly appropriate here, where Joseph had chronic medical impairments for which even his long-term treatment providers—those most able to "provide . . . detailed, longitudinal picture[s] of [her] medical impairments," *see* 20 C.F.R. § 416.913(a) (2015)—could not identify the cause, *see also Tolliver*, 2013 WL 100087, *3 ("[S]uch a familiar relationship may warrant apportioning more weight to [the nurse practitioner] than [the] consultative examiner . . . , on whom [the ALJ] heavily relied.").

[8] "Light work requires lifting and carrying up to twenty pounds occasionally and ten pounds frequently.  Many light jobs are performed while standing, and those performed in the seated position often require the worker to operate arm or leg controls."  Docket Item 12 at 24.

11

unprotected heights[; and h]e needs access to restroom facilities, but his time off-task can be accommodated by normal breaks."[9]  Docket Item 12 at 24.

Despite PA-C Larson's limiting Joseph's ability to sit, stand, and walk,[10] the RFC assumes that Joseph can stand for much of the day.  And despite PA-C Larson's opinion that Joseph would need two unscheduled bathroom breaks during the day and two days off work each month, the RFC limits Joseph to using the bathroom only on his

---

[9] The ALJ appears to have found additional limitations that she did not include in the RFC.  *See* Docket Item 12 at 29.  For example, later in the decision, the ALJ "limits [Joseph] to lifting and/or carrying twenty pounds occasionally and ten pounds frequently[;] sitting for two hours in an eight-hour workday and standing and/or walking for six hours in an eight hour workday[;] . . . never climbing ladders, ropes or scaffolds nor working at unprotected heights[;] . . . occasionally operating foot controls bilaterally[; and] . . . requir[ing] that he have access to restroom facilities [with] his time off-task . . . accommodated by normal breaks."  *Id.*  It is unclear to the Court, however, whether the ALJ meant that the RFC accommodated these additional limitations; meant that these limitations supplemented the RFC; or intended something else entirely.  And that frustrates this Court's efforts to "assess the validity of the agency's ultimate findings and afford [Joseph] meaningful judicial review."  *See Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008) (quoting *Young v. Barnhart*, 362 F.3d 995, 1002 (7th Cir. 2004)).

[10] Indeed, PA-C Larson, as well as Joseph's other providers, opined that Joseph needed to alternate among sitting, standing, and walking throughout the day.  *See, e.g.*, Docket Item 12 at 772, 779, 854-55.  And "[w]hen the record indicates that a [claimant] has significant limitations with regard to his ability to sit for extended periods of time, the ALJ should engage in a detailed discussion concerning [the claimant's] restrictions."  *Overbaugh v. Astrue*, 2010 WL 1171203, at *9 (N.D.N.Y. Mar. 22, 2010).  Under such circumstances, the RFC "must be specific as to the frequency of the individual's need to alternate sitting and standing."  SSR 96-9p, 1996 WL 374185, at *7 (July 2, 1996); *see also Overbaugh*, 2010 WL 1171203, at *9 ("Even though the treating physician set forth restrictions regarding [the claimant's] need to alternate between sitting and standing, SSR 96-9p and caselaw clearly dictate that the ALJ had a duty to specify the extent of the limitation.").  That is because a claimant's need to alternate between sitting and standing "may erode the occupational base"—for example, by making even sedentary or light work impossible to perform.  *See Overbaugh*, 2010 WL 1171203, at *9 (citing *Iannopollo v. Barnhart*, 280 F. Supp. 2d 41, 50 (W.D.N.Y. 2003)).  The ALJ failed to do this here.  Although Joseph does not raise this issue, it is another, independent error requiring remand.

"normal breaks." *See id.* In other words, the ALJ found that Joseph could physically do much more than PA-C Larson believed him capable of.

The testimony of the vocational expert suggests that had the ALJ assigned greater weight to PA-C Larson's opinions—and therefore found a more restrictive RFC—the ALJ very well may have decided that Joseph was disabled. The vocational expert testified that employers will tolerate "up to and including 10% of the workday [off task]," and "no more than one unscheduled absence on a frequent continuing basis." *Id.* at 79. Indeed, she testified that Joseph's taking five unscheduled bathroom breaks a day or needing to be within 100 yards of a restroom would make him unemployable. *See id.* at 79, 81. So if Joseph needs to take breaks or miss work as often as PA-C Larson contemplates, he very well might be disabled. *Cf. Hodgkin v. Comm'r of Soc. Sec.*, 2020 WL 1457625, at *6 (W.D.N.Y. Mar. 26, 2020) (noting "the vocational expert's testimony that six unscheduled bathroom breaks per day would preclude competitive employment").

What is more, the ALJ did not identify any other medical evidence that she relied on in lieu of PA-C Larson's opinions. *See* Docket Item 12 at 28-30. In fact, PA-C Larson was the only provider to address Joseph's need for bathroom breaks. So by discounting PA-C Larson's opinions, the ALJ necessarily and improperly relied on her lay judgment to formulate the RFC.[11] S*ee Balsamo v. Chater*, 142 F.3d 75, 81 (2d Cir.

---

[11] A very specific RFC assessment—such as the specific amount of time a claimant can spend on certain activities—must be based on evidence in the record, not on "the ALJ's own surmise." *Cosnyka v. Colvin*, 576 F. App'x 43, 46 (2d Cir. 2014) (summary order); *see also Mariani v. Colvin*, 576 F. A'ppx 8, 10 (2d Cir. 2014) (summary order) (holding that RFC to perform manipulation/fingering 50% of the time during a work day was not supported by substantial evidence); *Tomicki v. Berryhill*, 2018 WL 703118, at *5 (W.D.N.Y. Jan. 11, 2018) ("[T]he record does not support the

13

1998) ("In the absence of a medical opinion to support [an] ALJ's finding as to [a claimant's] ability to perform [a certain level of] work, it is well-settled that the ALJ cannot arbitrarily substitute his own judgment for competent medical opinion. While an ALJ is free to resolve issues of credibility as to lay testimony or to choose between properly submitted medical opinions, he is not free to set his own expertise against that of a physician who submitted an opinion to or testified before him." (citation and original alterations omitted)).

In sum, the ALJ erred in rejecting the opinions of PA-C Larson and instead crafting an RFC based on her own lay judgment. Because PA-C Larson opined that Joseph was far more limited in his ability to perform certain workplace functions than reflected in the RFC, and because the ALJ erred in not adequately evaluating PA-C Larson's opinions, the Court remands the matter so that the ALJ can evaluate those opinions using the appropriate criteria. And if the ALJ is not satisfied with the form or format in which PA-C Larson provided her prior opinions, or if she has questions about them, she should recontact or solicit a new opinion from PA-C Larson.[12]

---

ALJ's conclusion that she needs to briefly switch between sitting and standing only every thirty minutes. . . . Moreover, there is evidence in the record indicating that Tomicki needs to change positions every few minutes, not every thirty minutes."). Without "some explanation" from the ALJ "as to the tether between her RFC and the non-stale medical opinions or statements from plaintiff, the RFC [is] based upon her lay analysis of plaintiff's limitations, which is not permitted and requires remand." *Jordan v. Berryhill*, 2018 WL 5993366, at *3 (W.D.N.Y. Nov. 15, 2018).

So if the ALJ's later specific limitations—such as that Joseph can stand or walk for only six hours during an eight-hour workday and carry only twenty pounds occasionally and ten pounds frequently, *see* Docket Item 12 at 29—indeed were part of the RFC, that was error as well, *see Tomicki*, 2018 WL 703118, at *5

[12] The Court "will not reach the remaining issues raised by [Joseph] because they may be affected by the ALJ's treatment of this case on remand." *Watkins v. Barnhart*,

## **CONCLUSION**

The Commissioner's motion for judgment on the pleadings, Docket Item 17, is DENIED, and Joseph's motion for judgment on the pleadings, Docket Item 15, is GRANTED in part and DENIED in part.  The decision of the Commissioner is VACATED, and the matter is REMANDED for further administrative proceedings consistent with this decision.


SO ORDERED.

Dated:     May 18, 2021
           Buffalo, New York


                                           */s/ Lawrence J. Vilardo*
                                           LAWRENCE J. VILARDO
                                           UNITED STATES DISTRICT JUDGE

---

350 F.3d 1297, 1299 (10th Cir. 2003); *see also Bonet ex rel. T.B. v. Colvin*, 2015 WL 729707, at *7 (N.D.N.Y. Feb. 18, 2015) ("Given the need to apply the proper legal standard, the Court will decline at this time to consider whether substantial evidence exists to support the findings the ALJ made.").